K55sMORs

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        19 CR 209 (RMB)
                                         Telephone Conference
5    TERRANCE MORGAN,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         May 5, 2020
9                                        12:00 p.m.

10
     Before:
11
                    HON. RICHARD M. BERMAN,
12
                                         District Judge
13

14                       APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     ROBERT SOBELMAN
17        Assistant United States Attorney

18   SAM SCHMIDT
          Attorney for Defendant
19

20

21

22

23

24

25
```

K55sMORs

1          (The Court and all parties appearing telephonically)

2          THE COURT:  So we're here today for sentencing

3     following the Supreme Court's decision in the Gold case and

4     other cases.

5          Can I ask everybody to mute their phones if they are

6     not speaking?  Thank you.

7          We know that the United States Sentencing Guidelines

8     are no longer mandatory.  Instead of mandatory guidelines, the

9     court reviews factors listed at 18, United States Code, Section

10    3553(a), which I've done before coming to this conference

11    today.

12         Those factors include the nature and the circumstances

13    of the offense or crime, the history and characteristics of the

14    defendant, Mr. Morgan, the need for the sentence imposed to

15    reflect the seriousness of the crime, to promote respect for

16    the law, to provide a just punishment, to afford adequate

17    deterrence to criminal conduct, to protect the public from

18    further crimes, to provide the defendant with needed

19    educational or vocational training, medical care or other

20    correctional treatment in the most effective manner.

21         Doing that, we look at the kinds of sentences that are

22    available at the time of sentence and the sentencing range

23    established under the sentencing guidelines, even though those

24    are no longer mandatory.  We look at any policy statements

25    issued by the United States Sentencing Commission that may

K55sMORs

apply.  We seek to avoid unwarranted sentence disparities among

similarly situated defendants, and an in appropriate cases, to

provide for restitution.

    We start with a guidelines analysis.  The court

actually determines here that the guideline range would be

41 to 51 months of incarceration based on an offense level of

20 and a criminal history category of III.  But I hasten to add

that I am aware that the guideline range that I've computed

differs from that in the plea agreement, and that the plea

agreement does not reflect a particular conviction on March 14,

2018, for theft of property, among other things.

    So the defendant, Mr. Morgan, was serving a term of

probation for these offenses at the time of this instant

offense.  Anyway, that is what accounts for the difference

between 41 to 51 months under the guidelines and 33 to

41 months as agreed to in the plea agreement here.

    In reviewing the 18 U.S.C. Section 3553(a) factors,

this is what I have come up with.  Mr. Morgan pled guilty

before Magistrate Judge Aaron on October 17, 2019, to a

conspiracy to commit bank fraud.  He pled guilty pursuant to a

plea agreement that I mentioned a minute ago, which was dated

July 15, 2019, in which there was a stipulated or agreed to

guideline range of 33 to 41 months.  I accepted the guilty plea

on or about October 31, 2019.

    Mr. Morgan is 24, a citizen of Liberia and a permanent

K55sMORs

| | |
|---|---|
| 1 | resident of the United States, single, unmarried and has two |
| 2 | children.  According to the probation report, Mr. Morgan's |
| 3 | biological father died when he was a toddler and the |
| 4 | whereabouts of his mother are unknown.  He, Mr. Morgan, |
| 5 | immigrated to the United States from Liberia with his other |
| 6 | family members when he was approximately six years of age.  He |
| 7 | reported to probation that his transition in the United States |
| 8 | was difficult, particularly at a young age, in that the family |
| 9 | members and others he was with lacked adequate food and |
| 10 | clothing and resided with other refugees in a two-bedroom |
| 11 | apartment.  He also reported to probation that he was teased in |
| 12 | school because he was a poor immigrant. |
| 13 | Mr. Morgan further advised probation that his mother |
| 14 | punished him by beatings with belt buckles and other |
| 15 | inappropriate behavior at paragraph 74 of the presentence |
| 16 | investigation report, and he reported to probation that he left |
| 17 | his mother's home when he was age 16 and has not communicated |
| 18 | with her since that time.  So it would be some eight years, if |
| 19 | my math is correct. |
| 20 | There are somewhat conflicting accounts of Mr. Morgan |
| 21 | and his relationship to other family members.  I refer you to |
| 22 | presentence report paragraph 78 and 80, for example.  Defense |
| 23 | counsel, with respect to several of those issues, has stated |
| 24 | that the account of Mr. Morgan's relationship with other |
| 25 | relatives is incorrect in several respects. |

1          Mr. Morgan has denied any chronic physical medical

2     issues.  He noted that he has been experiencing flashbacks and

3     nightmares from the war, Civil War, I imagine, at paragraphs 89

4     through 91.  He reported some prior use of marijuana, but

5     indicated that he had stopped smoking in 2018 because it made

6     him sluggish.  It is somewhat unclear what Mr. Morgan's

7     educational level is.  The presentence report notes that he has

8     some college education and also notes that verification from

9     two different high schools was requested but not received for

10     purposes of this presentence report.

11          Mr. Morgan has some prior employment history as a used

12     car salesman and in various other capacities working at Macy's,

13     for example, and Kohl's department stores.  When he was a

14     teenager, he was employed in a barber shop and is also a rap

15     musician.

16          His prior criminal history, that includes assault in

17     the second degree, theft of less than $100, theft by

18     shoplifting, theft of property and criminal simulation.  It

19     appears that there may be two warrants outstanding.  One may

20     have been issued while Mr. Morgan was in federal custody and

21     the other appears to date back to 2016 in Baltimore County.

22          He was initially arrested on January 23, 2019, and

23     detained.  He was released on February 22, 2019.  And then on

24     March 6, 2019, he was detained on an unrelated matter and

25     subsequently transferred to the Southern District.

K55sMORs

1          By submission dated April 6, 2020, which by the way

2    has been supplemented on several occasions, including a very

3    recent submission which I saw for the first time today which

4    describes an official evaluation of the health conditions at

5    the MDC, the Metropolitan Detention Center, which is rather

6    startling.  I have no reason to believe it is anything but

7    accurate and I found it very helpful.  I'll make some reference

8    to that submission in a couple minutes.

9          Defense counsel states that when Mr. Morgan pled

10   guilty, both the government and the defense believed that the

11   guidelines range was 33 to 41 months.  Because that range was

12   driven by a very large intended loss that the undercover

13   officer had established.  He, Mr. Schmidt, Mr. Morgan's counsel

14   contemplated asking the court for a sentence of 15 to 18 months

15   as an appropriate one.

16         Now, this is defense counsel talking, that it has been

17   determined that Mr. Morgan's criminal history category is III

18   as opposed to I, his guideline range is acknowledged to be 41

19   to 51 months, as the court has determined and as I mentioned

20   before.

21         Under normal circumstances, says Mr. Schmidt, I

22   believe that a similar sentence or a slightly higher one would

23   be appropriate.  However, because of extraordinary

24   circumstances that our country is in, referring to the

25   coronavirus, especially in the New York metropolitan region,

K55sMORs

1    and that as of April 20, 2020, Mr. Morgan will have served some

2    14 months in the custody of the Bureau of Prisons ICE, I-C-E

3    in caps, and local custody.  He, Mr. Schmidt, on behalf of

4    Mr. Morgan is requesting a sentence of time served.

5            Defense counsel notes the difficult upbringing that

6    Mr. Morgan has had and how, at the age of six, he was a refugee

7    with members of his extended family, who had little, if any,

8    legal paperwork documenting who they were and what their

9    relationship was one to the other.

10           Defense counsel states, I have found that almost all

11   of Mr. Morgan's family has been less than forthcoming in

12   describing the relationships of the family members who escaped

13   to the United States.  It appears that none of the extended

14   family are U.S. citizens and still are lawful residents.

15           The ICE agent who investigated Mr. Morgan because of

16   this and prior cases informed defense counsel that Ferina,

17   F-e-r-i-n-a, Dokie, D-o-k-i-e, who was listed as Mr. Morgan's

18   mother, had applied for citizenship at least two times and has

19   been turned down.  As a result of the confusion and fear, both

20   the presentence report and letters from Mr. Morgan's family

21   reflect differing relationships.  Perhaps the most accurate

22   description was presented by Derrick, D-e-r-r-i-c-k, Dokie,

23   D-o-k-i-e.

24           Defense counsel also asked the court to consider the

25   defendant's role in the offense.  Counsel states that while

K55sMORs

Mr. Morgan may not have met all of the requirements to be a
minor participant, that is a term of art, his lack of authority
and discretion in the remuneration he expected to receive is a
very small portion of the fraud.

Defense counsel also states that codefendant Kamara,
K-a-m-a-r-a, is a friend of Derrick Dokie, D-o-k-i-e, Derrick
Dokie Junior, the relative Mr. Morgan was living with.
December 2018, Mr. Kamara told Mr. Morgan that he had a
Nigerian friend who obtained bank information that could help
access a bank account to get money.  The Nigerian needed
someone who spoke well and could communicate with the person
who had the skills to use the bank information to access this
account.  Mr. Kamara has a significant accent, while Mr. Morgan
is very well spoken.  Mr. Morgan was told that his share of the
illicit activity would be $10,000.  Knowing that it was clearly
illegal and wrong, but being in financial need, especially to
help support his children, he, Mr. Morgan, accepted the offer
and participated in the crime.

Defense counsel also asks the court to consider the
conditions of Mr. Morgan's confinement in general and
especially during the coronavirus pandemic.  Defense counsel
notes that upon completion of his SDNY sentence, Mr. Morgan
will likely be transferred to ICE custody.

Defense counsel states that he has been told that he
will likely be transferred to the Atlanta area, where his

K55sMORs

immigration case is pending.  While the immigration process is

pending, he will remain in custody because of the present

conviction for an aggravated felony.  Defense counsel's report.

        Because of the present crisis, the health crisis, it

is impossible to know how long Mr. Morgan will be in custody

prior to being deported, which is, I guess, the likely next

step, but we'll hear more from defense counsel about this.

        Defense counsel has submitted a letter written by the

defendant to the court.  The defendant's letter states, among

other things, that Mr. Morgan has gained insight into his

behavior in connection with this offense.  Defense counsel has

also submitted letters of support on behalf of Mr. Morgan, as

well as pictures of him with his children, which I have

reviewed.

        The letters describe Mr. Morgan as a family man, as a

man with a generous nature, and as a man who has found solace

in music.  One of the defendant's sisters wrote, Before the

arrest, Terrance and I volunteered at the Children's Refugee

Center in Clarkston, C-l-a-r-k-s-t-o-n, Georgia, every Friday

and Saturday for over ten years now.  I've never met anyone

like my brother.  He is truly an extraordinary young man,

caring, loving, bright, honest, family-oriented, but imperfect,

like we all are.

        For all of his birthdays, Terrance would purchase

clothes and hygiene products and distribute them to the

K55sMORs

1    homeless and less fortunate people all around rather than

2    celebrating at a fancy restaurant.  On Sundays after church,

3    Terrance would go to the hospitals and provide company to the

4    senior citizens, and then go out with friends to a bar.  He

5    would help teach kids to play football and soccer after school,

6    and he would mentor them rather than going home after a long

7    day of work.  That is a letter from N. Morgan.

8            By letter dated April 13, 2020, the government

9    requests a sentence within the stipulated guideline range of

10   33 to 41 months.  The government makes several points.  First,

11   it says a sentence within the stipulated guideline range would

12   appropriately reflect the nature and the seriousness of the

13   defendant's conduct.

14           The defendant and Kamara attempted to engage in a

15   sophisticated scheme to steal millions of dollars from an

16   innocent victim's bank account.  The scheme involved promising

17   hundreds of thousands of dollars of funds that they were

18   attempting to steal to an individual whom they understood to be

19   a corrupt employee of a wire transfer clearinghouse as a bribe

20   to assist them in stealing millions of dollars.  Mr. Morgan

21   traveled with Mr. Kamara from Georgia to New York to collect

22   the proceeds of their fraud scheme.  The defendant and Kamara's

23   conduct was brazen, egregious and deeply troubling.  This is

24   all from the government's submission.

25           Second, according to the government, a sentence within

K55sMORs

1    the stipulated guideline range is necessary to promote respect

2    for the law and to deter Mr. Morgan and others who are

3    similarly situated from participating in financial fraud

4    schemes.  In light of the seriousness of the defendant's

5    conduct and his status as an immigrant in the United States, it

6    is critical that the defendant's sentence make plain that there

7    is more risk to potential fraudsters who are foreign nationals

8    than merely being sent home.

9         Although removal from the United States is nearly

10   certain, it would be a collateral consequence of the

11   defendant's criminal conduct.  It is neither punitive nor does

12   it provide any meaningful measure of specific or general

13   deterrence.  A substantial period of incarceration within the

14   stipulated guideline range is necessary to send a message to

15   both the defendant and others similarly situated that

16   participants and potential participants in fraud schemes, using

17   those who, like the defendant, Mr. Morgan, are not United

18   States citizens, that significant consequences await if and

19   when they are caught participating in such criminal conduct.

20        There are also in the record, although they thankfully

21   are not needed today, waivers signed by Mr. Morgan.

22   Particularly this was in connection with the sentence which we

23   attempted to do two weeks ago where the system failed.  So

24   fortunately you don't need those waivers today because we have

25   Mr. Morgan present with Mr. Schmidt, the government, myself, my

K55sMORs

1   judicial assistant, my court deputy and, of course, the court

2   reporter.

3          So we are proceeding today via the court call

4   teleconferencing system.  Mr. Morgan is at the Metropolitan

5   Detention Center, and Mr. Schmidt, I don't know where he is,

6   but I can see him clearly, and I know that the government is

7   lurking somewhere in the background, but we don't have him on

8   the screen.

9          Counsel for the government, can you see us?

10          MR. SOBELMAN:  No, your Honor.  I don't have any video

11   capabilities, but I can hear your Honor clearly.

12          THE COURT:  OK.  We can hear you.  That's great.

13          I've also received and reviewed the presentence

14   investigation report in this case, which was approved on

15   January 9, 2020, along with an addendum and sentencing

16   recommendation of the same date.  I have correspondence from

17   defense counsel, Mr. Schmidt, dated April 6, 2020, and I have

18   that aforementioned letter from AUSA Robert Sobelman dated

19   April 13, 2020.  Then I have the supplements, particularly

20   Mr. Schmidt's supplement.

21          Counsel for the government, have you seen that too?

22   It is a letter dated May 5, 2020.

23          MR. SOBELMAN:  Yes, your Honor.  We received it

24   shortly before the proceeding commenced.

25          THE COURT:  That's when I got it as well.  It contains

K55sMORs

1    what is called a facility evaluation, Metropolitan Detention

2    Center COVID-19 response, which I did have a chance to review

3    before we got on the call.

4         I have to say, it is a very serious document.  It is

5    not surprising to me.  I've personally become acutely aware of

6    the deficiencies at both the MDC, particularly everybody

7    remembers last year during the winter, the absence of heat,

8    light, hot water.  It was just a disaster over there during one

9    of the coldest weeks in the winter.  It was so bad that family

10   members and friends were coming to the MDC with blankets so

11   that they could be passed up to their loved ones who were

12   incarcerated.

13        Frankly, it was an unacceptable, beyond unacceptable,

14   condition of an emergency to be sure, but based on a seriously

15   deficient system at core, which I frankly think is still

16   deficient.  I think similarly, I regret and am constrained to

17   say, I have similar very serious doubts about the ability of

18   the MCC, who housed basically improperly persons who are

19   detained.

20        I am very, very, very disappointed that the U.S.

21   Attorney General has failed, to my knowledge, to conduct a

22   thorough assessment and investigation of the Bureau of Prisons

23   nationwide.  But in particular, this was something he pledged

24   to do at the time of Jeffrey Epstein's suicide at the

25   Metropolitan Correction Center.  That was a case that I had,

K55sMORs

 1    and that suicide occurred in August of last year.

 2             To my knowledge, there have been no forthcoming

 3    serious reviews of the living conditions at either the MCC or

 4    the MDC, which are only many times compounded by this

 5    coronavirus that is plaguing the country, but in particular,

 6    the country's prisons.

 7             It is an outrange, I have to say, and I'm very

 8    disappointed that the Attorney General has not followed through

 9    on making a thorough investigation of conditions that those of

10    us in the business, as it were, are all too familiar with, and

11    more importantly, has not implemented appropriate changes.

12             So I was just going to mention from the submission of

13    Mr. Schmidt, the submission itself was prepared by a doctor

14    named Dr. Homer, H-o-m-e-r, Venters, V-e-n-t-e-r-s.  It is

15    thoughtful.  It is 22 pages long.  Right off the bat, on page

16    one, he says that he visited the Metropolitan Detention Center

17    in Brooklyn on April 23, 2020, and was alarmed by the

18    facility's failure to implement simple procedures in line with

19    the Center for Disease Control guidelines that could identify

20    patients who are ill with COVID-19, that could prevent the

21    spread of COVID-19 throughout the facility, that could ensure

22    that high-risk patients received adequate care.

23             Again, right out of the block, he says multiple

24    systemic fractures in the COVID-19 response at the MDC, which

25    is where Mr. Morgan is housed, impeded the facility's ability

K55sMORs

1  to know when people become ill with COVID-19.  Most people

2  within the MDC are not being effectively screened for COVID-19

3  signs or systems.  It is odd to say the MDC's response to

4  COVID-19 is largely reliant on a broken sick call system that

5  does not function adequately.

6       So I commend the entire report to your consideration.

7  It deserves a thorough evaluation, and more than that, it

8  requires that there be a Federal Bureau of Prisons response to

9  the criticisms that are contained in that report.  Such a

10  response is long overdue.  It was overdue long before Jeffrey

11  Epstein committed suicide.  Long before then.

12       Those of us on the bench in the Southern District and

13  the Eastern District were fully -- not fully, I would say --

14  but anecdotally, for each of our cases, apprised of the

15  unfortunate terrible conditions in these two federal

16  facilities.

17       They are dirty.  They are infested with drugs.  You

18  can get drugs and other contraband at the drop of a hat.  There

19  is violence that goes on.  There is an element -- well, I'll

20  stop there for now.  I think you get my drift, and I just

21  wanted to mention that and bring it to your attention.

22       So I have a question for Mr. Morgan and defense

23  counsel, and that is, have you each had the opportunity to read

24  and discuss the presentence investigation report in this case?

25       Mr. Schmidt, did you have a chance to go over that

K55sMORs

1    report with Mr. Morgan?

2              MR. SCHMIDT:  Yes, I was able to do so, your Honor.

3              THE COURT:  Mr. Morgan, you read over that presentence

4    investigation report with your counsel?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Do either of you, starting with

7    Mr. Schmidt, have any objections to the content of that report

8    other than ones that you have noted before?

9              MR. SCHMIDT:  No, your Honor.

10             THE COURT:  Mr. Morgan?

11             THE DEFENDANT:  No, your Honor.

12             THE COURT:  So then I will return the presentence

13   report to the probation department, which is our practice, and

14   I'm happy at this time to hear from Mr. Schmidt, Mr. Morgan,

15   and from government counsel.

16             MR. SCHMIDT:  Your Honor, I think I've covered, to a

17   great extent, discussions of Mr. Morgan's background and the

18   offense conduct and the offense in general, the nature of the

19   offense, how Mr. Morgan got involved in it, who conducted most

20   of the activity.

21             So I don't think I'll need to comment more, unless

22   your Honor has a specific question concerning that, or in

23   response to maybe something that the government says.

24             I will note that your Honor mentioned an assault in

25   the second degree conviction.  This was a case when Mr. Morgan

K55sMORs

was 15 years old.  It was not reported, so I'm assuming that it

was a juvenile finding, and as Mr. Morgan said, when he was

younger and in high school, he got into a lot of fights, mostly

to protect himself.  Other than that, the convictions that he

has are theft-related convictions, especially in the beginning

were things like food, baby clothing, etc.

I would note that the warrants were for two pending

cases.  These are cases that I kept in touch with the lawyers

about that he was going to report to those cases when he was

released on bail, and until he was picked up by the violation

of a probation, which was for illegal parking in Georgia, which

was ultimately dismissed, but held on an immigration warrant.

So those, he had bail on those cases.  Bail was

exonerated in those cases because of his ultimate commitment,

by being held by immigration, and by being brought up to the

Southern District of New York.

What I think is, at this point, the only matters that

need to be discussed further was, in many ways, covered by your

Honor in explaining what is happening at the MDC and the MCC.

I note that Mr. Morgan has suffered from severe tooth pain for

a number of months.  And after I wrote a letter, first an

e-mail of the complaint to the MDC and then wrote a letter to

your Honor, he actually was able to see a dentist.  He was

given -- not see a dentist.  He was given ibuprofen, I believe,

two days in a row, and then he has not received ibuprofen even

K55sMORs

1    since then.

2            This is actually not the only client I have who has

3    had a problem with teeth and has not been able to see a dentist

4    or get anything done.  It really appears that the system, as

5    the doctor indicated, is broken.  The sick call system.  It is

6    even more broken now because of the COVID-19, and so many

7    inmates are not receiving adequate medical care.  One doesn't

8    know when Mr. Morgan will even be able to have the problem

9    dealt with.

10           More important than just simply having a tooth that is

11   driving him crazy is what is going to continue for as long as

12   he's incarcerated.  My understanding now of what's been

13   happening with inmates who have ICE detainers is one of two

14   things.  It seems to be apparently about half of the pretrial

15   detainees who are released on bail because of the coronavirus

16   have not been picked up and are home as pretrial detainees.

17   Others have been picked up and moved to ICE facilities.  I have

18   not heard much about inmates who have completed their time,

19   whether or not ICE is picking them up or not.

20           So one of two things is going to happen to Mr. Morgan

21   when he completes his time, either today or a longer time, is

22   that he is either going to be picked up by ICE in a few days

23   upon completion of his time or he is going to be released.  And

24   what we're asking your Honor to do is give him a sentence of

25   time served with three months of home confinement so he is

K55sMORs

1    required to remain in his home in Georgia.  He'll be available

2    to ICE when ICE gets around to dealing with the problem that

3    they have, and he will deal with his conviction for an

4    aggravated felony and the ultimate result of being deported.

5          My submission that I talked about what I was going to

6    ask for.  Almost every day I read -- I have a couple of hours

7    of reading at the end of the day of material that I receive

8    from the federal defender and National Association of Criminal

9    Defense Attorneys and others around the country as to what is

10   happening in our prisons, the lack of honesty and openness in

11   the Bureau of Prisons.

12         Mr. Morgan fortunately is young.  Mr. Morgan is not a

13   person who is "at risk," however, they are finding more and

14   more things that are occurring on people who have been found to

15   have the COVID-19 virus that were unknown.  There are lung

16   problems, heart problems, stroke problems.  So while most

17   people survive to not have long-lasting effects, we don't know

18   who are the chosen ones.

19         On the nature of this case, of course, it would not be

20   inappropriate normally for your Honor to sentence Mr. Morgan to

21   more than time served, which is now about 14 and a half months,

22   not counting the time he might be in further custody from ICE.

23   I can't say that your Honor would be unreasonable to do that.

24   But it seems that we have to start to rethink what is happening

25   in our prisons and the impact of people who are incarcerated.

K55sMORs

1          Pre coronavirus, if someone who had just a little bit

2     of time left to serve -- a year, less than a year -- would go

3     to a facility where it would be humane.  They would have

4     substantial freedom in the facility.  It would be imprisonment,

5     incarceration, but it would not be a horrendous experience.

6     And punishment may be just.

7          Now, the effect of incarceration is hard to put a

8     number on.  Is it twice as bad as it used to be, three times as

9     bad, four times as bad, especially for somebody who going to

10    remain in a detention facility and not in an actual prison, low

11    or medium prison.  He is going to be in a detention facility,

12    which is even worse.

13         So we're talking about imprisonment.  We're not

14    talking about the same kind of imprisonment that existed two,

15    three, four, five years ago in these facilities.  We're talking

16    about much worse, much more difficult, much more dangerous.

17         So we asking are your Honor for a sentence of time

18    served, which is 14 and a half months, and may include time in

19    ICE until they eventually deport him.  I don't think it is

20    unreasonable.  I think it is appropriate under these

21    circumstances.

22         If your Honor has any other questions concerning the

23    intent for Mr. Morgan, as set forth in the background section

24    of my submission, I would be happy to answer it.  I

25    respectfully request that your Honor sentence him to time

K55sMORs

served with three years' supervised release, with the first

three months of supervision in home confinement in the home

where he was living with Mr. Dokie.

THE COURT:  Do you have the address?

MR. SCHMIDT:  I do have the address.  Perhaps

Mr. Morgan --

I think I have it in the report here.

(Pause)

I believe it is 720 Harbor Crossings, Lithonia,

Georgia.

Is that right, Mr. Morgan?

THE DEFENDANT:  Yes.  As of now, that is accurate.

Yes, as of now, that is accurate.  I've been incarcerated so

long, honestly, I don't know the exact address, but as of now,

yes, that's accurate.  If it does change, I can let the courts

know.

MR. SCHMIDT:  Your Honor, I did speak to his cousin

approximately a week before the last date that we were

scheduled for sentencing.  He confirmed that Mr. Morgan would

be welcome to come back there.

THE COURT:  So that is Mr. Dokie, D-o-k-i-e.

What is that address again?

MR. SCHMIDT:  It is 720 Harbor Crossings.  It is in

Lithonia, L-i-t-h-o-n-i-a, Georgia 30058.

THE COURT:  Now, I take it that if that address is not

K55sMORs

1    current for Mr. Dokie, it is whatever address, does Mr. Dokie

2    still live in Lithonia, Georgia?

3            MR. SCHMIDT:  Your Honor, as I said a week before the

4    last hearing, he was living at that address and he confirmed

5    that to me on the telephone.

6            THE COURT:  720 Harbor Crossings.  OK.

7            Does anybody have a phone number for Mr. Dokie?

8            THE DEFENDANT:  I do have my sister number, Newah

9    Morgan, and she has his number.  I don't know his number off

10   the top, but I know my sister number.

11           MR. SCHMIDT:  I have it.  I just need to find my notes

12   where I wrote it down, because I've talked to him a number of

13   times and his wife.

14           THE COURT:  Mr. Morgan, what is your sister's name?

15           THE DEFENDANT:  My sister name is Newah Morgan.

16           MR. SCHMIDT:  N-e-h-w-a-h?

17           THE DEFENDANT:  N-e-w-a-h.  Newah Morgan.

18           She is actually, for the record, if I misstate, she is

19   actually willing for me to come to her home also.  I just spoke

20   to her yesterday when we had a chance to talk.

21           THE COURT:  Do you know her address?

22           THE DEFENDANT:  Um, honestly, I do not have the

23   current address right now, just a zip code.  She actually gave

24   it to me.  I was not able to get it.  They was rushing me in

25   here.  I was trying to get it.  I was not able to get it

K55sMORs

1   because they was rushing me in here.

2          THE COURT:  Do you have a telephone number for her?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  What's that?

5          THE DEFENDANT:  (404) 556-3128.

6          THE COURT:  She lives in Georgia for sure, but what

7   city?

8          THE DEFENDANT:  Her zip code, she lives in

9   Lawrenceville, Georgia, and her zip code is the same as the one

10  that is on her letter, which is 30345.  That's in the

11  Lawrenceville, Gwinnett County area of Georgia.

12         THE COURT:  I got it.

13         OK.  Mr. Schmidt, are you through?  We'll hear from

14  Mr. Morgan and from the government.

15         THE DEFENDANT:  You would like to hear from me now,

16  your Honor?

17         THE COURT:  You don't have to, but if you wish to be

18  heard, I'm happy to hear from you.

19         THE DEFENDANT:  Yes.  Yes, I definitely wish to be

20  heard.

21         Good afternoon everybody that is here today.  Um, I

22  would like to start by extending my deepest gratitude to

23  everyone here today and what is presently taking place on our

24  planet.  I want to thank your Honor for hearing to my case.  It

25  has been 14 months --

K55sMORs

1          THE COURT:  Mr. Morgan, you have to slow down a little

2     so the court reporter can get it all down.

3          THE DEFENDANT:  OK.  All right.  I'm starting over.

4          I would like to extend --

5          THE COURT:  You don't have to start over.  You don't

6     have to start over.

7          THE DEFENDANT:  OK.  Um, it has been 14 months and

8     three weeks to this exact moment of my arrest that I willingly

9     got involved in this game by accepting a phone call from

10    someone I never met and demonstrates my lack of rational

11    thinking and stupidity.

12         One important lesson life has taught me is to always

13    be man enough to admit when you are wrong.  And as the

14    government rightfully stated in its submission, no role in this

15    conspiracy can be considered small.  Wrong is wrong no matter

16    how big or small.

17         I can sit here and try to explain what happened, who

18    should take the ultimate blame, but admitting you are wrong

19    with an excuse to follow is still trying to justify your

20    wrongdoings.  So I say I was wrong and I deeply apologize.

21         My deepest apology goes out to my kids, having to one

22    day explain to them why Daddy was gone for so long, and maybe

23    forever is something I have to live with.  I am so sorry to

24    their mothers for having to provide for them as a single

25    parent.  Providing for them as a co-parent is a difficult task

K55sMORs

both financially and emotionally, but having to do it alone is
something no parent should have to endure.  I know this because
I've had to live without a father myself.

          For the past 14 months I have been in prison, I have
been dehumanized and treated like an animal --

          Excuse me.  The phone was ringing.

          For the past 14 months I've been in prison, I have
been dehumanized and treated like a number, not a person.  I've
spent multiple nights crying and asking the creator for mercy
on my soul.  I have had to live with not being able to see my
babies, nor have I seen any family members or friends.  I'm
sure, as young as my kids are, they have asked themself, I'm
sure as young as my kids are, they have asked themself, Does
Daddy not love me anymore?  If so, why has he completely
disappeared from me.

          I know these questions also work because I have had to
ask myself those same exact questions in the past.  As the
world is going through a global pandemic and people are dying
by the thousands, not being by my kids' side makes me feel
cowardly.  Fathers are supposed to be able to protect them at
all times.  The one who you consider your superhero.

          Whatever decisions your Honor makes today, I'm sure
God will be involved.  All I ask is that your Honor please take
into consideration that dying behind bars is an outcome that
could possibly take place if I have to return to serve more

K55sMORs

1    time.

2           The current conditions of the prison system are worse

3    than ever.  We have been on lockdown for the past month and a

4    half.  We are only allowed three hours a week to take a shower,

5    talk on the phone, and respond to e-mails.  If your Honor feels

6    in any way that I have not learned my lesson in the matter, I

7    respectfully ask to be placed on home confinement to complete

8    the rest of my time.

9           On home confinement, I will not be able to escape from

10   ICE.  They will be able to get me from my home.  They already

11   granted me bond, but I can assure your Honor and the government

12   that I have used every second, minute, hour, day and months to

13   realize prison is not a place for me or anyone who is looking

14   to improve their life.

15          This experience has allowed me to converse with people

16   who would never have a chance to unit with their family

17   members.  Just the thought of that scares me to death.  I have

18   also realized that not any opportunity to make money -- I also

19   realized that any opportunity to make money illegally that

20   comes your way is not worth risking your freedom.  A pessimist

21   sees difficulties in every opportunity.  An optimist sees the

22   opportunity in every difficulty.  I stand before you today an

23   optimist.

24          Lastly, I would ask your Honor to please take into

25   consideration that I have not received any disciplinary tickets

K55sMORs

1    for the 14 months I've been incarcerated.  I've used this time

2    to plan things I plan to accomplish in life and the steps I

3    need to take to reach those goals.

4           If God allows me to stay in America once I get out, I

5    will enroll in a trade school to become an electrician.  I have

6    also used this time in jail to earn three certificates.  I have

7    also used this time in jail to earn three certificates.

8           I conclude my speech by telling my attorney that you

9    are greatly appreciated.  You have treated my case as if I came

10   out my pocket to pay you thousands of dollars.  I have never

11   once tried to get in contact with you and not received an

12   answer.  You went above and beyond to see to it that we are

13   always on the same page.  You are a true definition of a legal

14   counsel, and for that, I will always have a place -- you will

15   always have a place in any heart.

16          Thank you, your Honor, for your time and

17   consideration.

18          THE COURT:  You're welcome.

19          OK.  How about the government, Mr. Sobelman?

20          MR. SOBELMAN:  Your Honor, I believe that the

21   government responded to the points made by Mr. Schmidt in our

22   submission.  If your Honor has any questions or wants me to

23   address anything in particular, we would be glad to do so, but

24   if not, we can rest on our submission.

25          THE COURT:  OK.  I do have a concern about what

K55sMORs

1    happens with Mr. Morgan when his sentence is over, whether that

2    be today or in a month or a year or whatever.

3            Do you have any more clarity about that than

4    Mr. Schmidt as to what happens to him?

5            MR. SOBELMAN:  No, your Honor.

6            In ordinary times, we would expect that ICE would

7    promptly take him into custody on the completion of whatever

8    sentence your Honor imposes.  I haven't been able to determine

9    what precisely ICE would do in this case.  I suspect they would

10   be more likely to take him into custody than those who are on

11   pretrial release, because Mr. Morgan will have no further

12   proceedings, at least in the federal system, before being put

13   in deportation proceedings.  But it is not certain.

14           I'll note that Mr. Morgan has not consented to a

15   judicial order of removal.  We offered that to him and he

16   declined to do that.  I understand he certainly doesn't have

17   to, and he may happen to seek an order to try to stay in the

18   United States despite this conviction, but that is another

19   aspect that leaves some uncertainty.

20           THE COURT:  When he gets released from the MDC, they

21   release him, just say, here's the door and good luck, or do

22   they take him to Georgia or put him on a bus?

23           MR. SOBELMAN:  There are a couple of different

24   scenarios.  One, assuming he has a detainer from ICE, which I

25   think is a fair assumption, the marshals generally give ICE a

K55sMORs

certain period of time -- I think it is often a couple of days,

sometimes slightly longer -- to retrieve the inmate or detainee

and take them into custody.  So that is one scenario.

        Another scenario is that I take Mr. Schmidt's word

that the state proceedings have concluded.  I just don't know

the details myself.  It is possible that, for example, his

parole violation has a hold on him or detainer on him and that

he is put into interstate transport back to Georgia in order to

see through the end of that proceeding before immigration

decides to act.

        So there are a couple of different options.  Even if

there were a state detainer and an ICE detainer, if both waived

their interests, given the circumstances, of taking Mr. Morgan

into custody now, which would be in their discretion, then

Mr. Morgan would be released after a short hold time from the

facility, and he would go wherever your Honor -- presumably go

wherever your Honor ordered him to go to serve the beginning of

his supervised release.

        But we really won't know what happens until his

sentence is completed and the relevant authorities then make a

decision about what, if anything, they want to act on.

        THE COURT:  Do they hold him at MDC while they make

that determination or someplace else?

        MR. SOBELMAN:  My understanding is they are held

whenever they have been for, I think it is often a couple of

K55sMORs

1   days, while they give the detaining parties time to pick him

2   up.

3           THE COURT:  OK.  That's very helpful.  Thank you.

4           I'm going to then adopt the findings of fact in the

5   presentence investigation report, unless defense counsel has

6   any remaining objections that have not been submitted.

7           MR. SCHMIDT:  I have no remaining objections.

8           Your Honor, if I may, I can add a little bit to what

9   is going to happen with Mr. Morgan.  It is unlikely, at this

10  period of time whether there is a hold or not with the state,

11  they are actually going to pick him up because of what is going

12  on with the coronavirus.

13          Mr. Morgan indeed has a hold because he was brought up

14  by writ to the Southern District.  The government brought him

15  up by writ.  So he is, indeed, an ICE detainee as well, and so

16  the real question is whether or not ICE is going to pick him up

17  or not.

18          I do know for certain that they have picked up some

19  people who were finished with their sentence.  I don't know if

20  they have picked up all or not, but I know they have picked up

21  some.

22          If he is released from MCC, MDC, and no one picks him

23  up, then I will actually have to prepare an order for your

24  Honor's signing to get to the United States Marshal Service so

25  they can provide airfare to Mr. Morgan so he can return to

K55sMORs

1    Georgia.

2              I also need to get an order from your Honor

3    identifying him because he has no identification records, but

4    I've done that previously with a client who was released from

5    jail.  It makes things a little more complicated because of the

6    pandemic, but it's been done and I know how to do it.

7              THE COURT:  You do that today or you do it when?

8              MR. SCHMIDT:  Well, he's not going to be released

9    today.  He will know by, I'm guessing, Thursday, perhaps

10   Friday, whether he is getting released or not.  If your Honor

11   does sentence him to something to the nature of time served,

12   what I'll be doing is preparing those orders now and holding on

13   to them or maybe getting them signed by your Honor to have them

14   available if he is released.

15             I have someone who I view as a paralegal who lives in

16   Brooklyn that would be able to meet him, if he is released, at

17   the facility and physically help him get to either the U.S.

18   Marshal service or to the airport, depending on how we're

19   dealing with our situation.

20             THE COURT:  You're saying that, from what you

21   understand, they are really down to two options; one is whether

22   ICE determines to pick him up and take him back to Georgia or

23   not?

24             Are those the options?

25             MR. SCHMIDT:  I believe that is the alternative.

K55sMORs

1          THE COURT:  You're saying that, so whenever his

2    sentence is over, he immediately starts a sentence of

3    supervised release, as you'll hear in a minute, and the

4    question is how is he going to get and what those -- if one of

5    the conditions of supervision is going to be that he live with

6    either Derrick Dokie or his sister in Georgia, so he is going

7    to have to get to Georgia, obviously, to be able to complete

8    his sentence.

9          Now, is he subject to any quarantine provisions upon

10   leaving MDC and going somewhere else?

11         MR. SCHMIDT:  I don't know.  I have not been told that

12   he personally has any quarantine restrictions.  Whether the MDC

13   does something prior to release, I don't know.  I know in the

14   past, some judges who have released people either on

15   compassionate release or bail have put orders in requiring the

16   immediate release of the person, as opposed to the Bureau of

17   Prisons at that time a policy of holding somebody in isolation

18   for 14 days before they release him.

19         So I know that a court order, if that is what they are

20   going to do, has worked.  And, indeed, if I hear that MDC is

21   doing that, I would come back to your Honor with a court order

22   to have him released.

23         THE COURT:  All right.  Any further objections to that

24   presentence report from you, Mr. Morgan?

25         THE DEFENDANT:  No, your Honor.  No further

K55sMORs

1    objections.

2          Just lastly, just to state that without excuse, I've

3    never in my life thought about committing a crime, and this

4    unfortunately is what is going to ultimately, if it does, get

5    me deported away from my children and is deeply devastating.

6    But, you know, these are the consequences I unfortunately have

7    to live with because of the amount in which this crime was

8    conducted.

9          As far as the ICE hold, a prior was only because I

10   stated that I was a citizen, assuming that I was because my mom

11   applied and told me that she got it, and I stated I was a

12   citizen.  So ICE put a hold on me with a bond of $25,000.

13         And then also to add with this case, the amount being

14   an aggravated felony is what is ultimately possibly going to

15   get me deported back to a country I haven't been to my entire

16   life basically.

17         MR. SCHMIDT:  If I may, I confirmed that in our

18   conversations that his original ICE detention was because he

19   said he was a citizen because, based on our discussions, he

20   believed his mother obtained citizenship before he turned 18.

21         We believed that he was a citizen.  It took us an

22   awful long time to get the information from ICE that his mother

23   was denied as opposed to granted.

24         THE COURT:  OK.  All right.  I am prepared to go

25   forward.  Let me preview the sentence and then I will impose

K55sMORs

1    it.

2           Hold on one second.  Chelsea, do we have time to

3    continue?  How much time do we have here?

4           LAW CLERK:  I requested an hour and a half for this

5    proceeding.

6           THE COURT:  Counsel, I wonder if we should not,

7    instead of having a preview of the sentence, just move to

8    imposing the sentence so we make sure that we complete the

9    sentencing today.

10          Is that OK with you?

11          MR. SCHMIDT:  That is fine, your Honor.

12          THE COURT:  Mr. Sobelman?

13          MR. SOBELMAN:  Yes, your Honor.

14          THE COURT:  OK.  So here is the sentence that I am

15   imposing.  The guideline range is 41 to 51 months.  The

16   stipulated guideline range is 33 to 41 months in the plea

17   agreement.

18          Having considered the Sentencing Reform Act of 1984

19   and having reviewed factors as 18, United States Code, Section

20   3553(a), it is the judgment of the court that Terrance Morgan

21   is hereby committed to the custody of the Bureau of Prisons to

22   be imprisoned for a term of what we call time already served,

23   just approaching 15 months, if you consider MDC and other ICE

24   incarceration.

25          As soon as he is released from imprisonment, if he

K55sMORs

remains in this country and is not deported, then I'm imposing

a term of four years of supervised release subject to the

following conditions:  That he not commit another federal,

state or local crime; that he not illegally possess a

controlled substance; that he refrain from any unlawful use of

a controlled substance; that he submit to one drug test within

15 days of placement on supervision and at least one scheduled

drug test thereafter, as may be directed by a probation

officer.

        In addition, he is required to comply with what are

called standard conditions 1 through 12.  Those include, among

others, that he not possess or have access to a firearm,

ammunition, destructive device or dangerous weapon, which is

defined as anything that was designed or modified for the

specific purpose of causing bodily injury or death to another

person.

        Plus the following special conditions:  He will be

supervised in his district of residence immediately upon

release.  He is required to live in Georgia with, first of all,

Mr. Derrick Dokie, D-o-k-i-e, last known address 720 Harbor

Crossings, Lithonia, L-i-t-h-o-n-i-a, Georgia 30058, described

as a cousin, or with his sister, pronounced N-e-w-a-h Morgan,

no address except that she lives in Lawrenceville, Georgia

30034, and her telephone number area code (404) 556-3128.  He

is subject to three months of home confinement at either

K55sMORs

1   Mr. Dokie's or his sister's, and the first 14 days of

2   confinement there are to be self-quarantined.

3           He is to report to the probation department.  Defense

4   counsel will give him the number of the probation department in

5   New York as soon as you can.  He is to report to probation by

6   telephone, if not in person, within 24 hours of release from

7   custody.

8           He will also be required to participate in weekly

9   therapeutic counseling by a licensed therapist.  He may be

10  required to contribute to the costs of services rendered via

11  copayment in an amount to be determined by the probation

12  officer based on ability to pay and availability of third-party

13  payment.

14          He is also required, during the term of four years'

15  supervised release, to participate in a program approved by the

16  probation office for substance abuse.  That program shall

17  include testing to determine whether he is using drugs or

18  alcohol.

19          He's also required to cooperate fully with the

20  Department of Homeland Security Bureau of Citizenship and

21  Immigration Services in connection with any proceedings that

22  they may bring to determine his status in the United States,

23  and he's required to abide by their rules and regulations.

24          I am not imposing a fine.  None is recommended in the

25  presentence materials.

K55sMORs

1          I am not imposing restitution because there is no

2     victim within the meaning of 18, United States Code, Section

3     3663 or 3663(a).

4          I am imposing a special assessment of $100, which is

5     mandatory and actually due immediately.

6          The reasons for the sentence are that I have

7     considered the guideline range and the other factors that I

8     mentioned at the outset of 18, United States Code, Section

9     3553(a).  I don't disagree that the crime here was a serious

10     one, but I do feel that the purposes of deterrence, general and

11     specific, have been met and are being met by this sentence.  I

12     think that the term of incarceration, the amount of

13     incarceration that he has served already, is adequate for the

14     purposes of coming up with a fair and reasonable sentence.

15          I do point out, again, the conditions of the MDC

16     during this, particularly during this difficult coronavirus

17     time, but also across the board even before the coronavirus

18     erupted.

19          The conditions of home confinement for three months

20     and quarantined for the first 14 days I think are significant,

21     and the therapeutic counseling and drug treatment will be the

22     most beneficial aspect of this remaining sentence.

23          I also note that the separation of Mr. Morgan from his

24     children has been severe, and I've taken that into

25     consideration as well.

K55sMORs

1          Defense counsel, you're going to have to, as you

2     mentioned before, play the role of submitting any proposed

3     orders that may be necessary to implement this sentence, and

4     also to direct and guide Mr. Morgan to Georgia if he is

5     released.  I'm sure you will do that ably.

6          Does either legal counsel know of any reason why this

7     sentence should not be imposed as so stated, starting with the

8     government?

9          MR. SOBELMAN:  No, your Honor.

10         THE COURT:  How about the defense?

11         Mr. Schmidt, are you aware of any legal --

12         MR. SCHMIDT:  No, your Honor.  No objection.

13         THE COURT:  Then I hereby order that the sentence be

14    imposed as so stated.

15         Mr. Morgan, to the extent that you have not already

16    waived your appeal rights pursuant to the plea agreement, now

17    I am talking about the agreement dated July 15, 2019, in which

18    you did waive appellate rights, you agreed to waive your right

19    to file a direct appeal.

20         You also have agreed to waive your right to bring a

21    collateral challenge, including but not limited to habeas

22    petitions, under United States Code, Sections 2255 and/or 2241,

23    of any sentence that is within or below the stipulated range of

24    33 to 41 months.  This sentence is clearly below that

25    stipulated guideline range.

K55sMORs

1          You also agreed to waive your right to challenge your

2     conviction or sentence on direct appeal or through litigation,

3     as I mentioned, under Sections 2255 and 2241, on the basis of

4     any actual or perceived adverse immigration consequences,

5     including removal, which result from your guilty plea and

6     conviction.

7          So apart from those waivers which you have entered

8     into, Mr. Morgan, I notify you that if there are any other

9     rights that I have failed to mention that apply, then you would

10    have the right to appeal your sentence.  If you are unable to

11    pay the cost of an appeal, you have the right to apply for

12    leave to appeal *in forma pauperis*.

13         So the question to you, Mr. Morgan, is do you

14    understand the waivers of appeal that you have agreed to?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  Do you understand your appeal rights

17    generally at this point?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  Question for the government:  Are there

20    any aspects of this case that you are seeking to resolve or

21    dismiss at this time?

22         MR. SOBELMAN:  Yes, your Honor.

23         The government moves to dismiss Count Two of the

24    indictment with respect to this defendant.

25         THE COURT:  The application is granted.

K55sMORs

1          Finally, starting with the government, did you wish to

2     add anything to today's sentencing proceeding?

3          MR. SOBELMAN:  Your Honor, I just want to make sure

4     the record is clear, especially because I'm only on the phone,

5     that your Honor, Mr. Schmidt and Mr. Morgan could all see each

6     other on video conference, as well as hear each other on audio?

7          THE COURT:  Fair enough.

8          Mr. Schmidt?

9          MR. SCHMIDT:  Yes, I was able to see both your Honor

10    and Mr. Morgan.

11         THE COURT:  Mr. Morgan, you were able to see me and

12    your lawyer?

13         THE DEFENDANT:  Yes, I was able to see both your Honor

14    and my attorney.

15         THE COURT:  OK.  Let me ask it in another way,

16    Mr. Schmidt.  I think I know the answer.

17         But is Mr. Morgan, in your understanding, agreeable to

18    waiving any rights that he might have as a result of our

19    participating today on this court call video-audio system that

20    included the individuals just mentioned, but did not include

21    the Assistant U.S. Attorney on the video portion?

22         MR. SCHMIDT:  Yes, he does, your Honor.

23         THE COURT:  Mr. Morgan, is that right, you're waiving

24    any rights that you might otherwise have as a result of our

25    proceeding today in this tele-audio method as opposed to in a

K55sMORs

1    live courtroom?

2            THE DEFENDANT:  Yes, that's accurate, your Honor.

3            THE COURT:  OK.  Mr. Sobelman, does that work?

4            MR. SOBELMAN:  Yes, your Honor.

5            I'll also just note that the public access number was

6    docketed prior to this proceeding, and that the government has

7    learned from the agent on this case that that number has been

8    working and he has been able to attend the proceedings, as I

9    imagine some others have.

10           THE COURT:  I don't know who is attending, but we made

11   sure that the access number was available to the media, to the

12   public, friends and persons interested in the case, to the best

13   of our abilities.  I think we were successful.

14           Anything else that you wanted to add, Mr. Schmidt?

15           MR. SCHMIDT:  Nothing further to add, your Honor.

16           THE COURT:  Nothing further from Mr. Sobelman?

17           MR. SOBELMAN:  That's correct, your Honor.

18           THE COURT:  How about from you, Mr. Morgan?

19           THE DEFENDANT:  From me, your Honor, I just want to

20   extend, as I stated, my deepest gratitude for rendering that

21   sentence, and I will be sure to use this as a grateful life

22   lesson for me and my kids.  Thank you very much.

23           THE COURT:  You're welcome, and I wish you the best of

24   luck going forward.

25           THE DEFENDANT:  Thank you.

K55sMORs

1                 THE COURT:  I think we're adjourned then.

2                 MR. SCHMIDT:  Thank you, your Honor.

3                 THE COURT:  Thanks very much, everybody.

4                               *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25